1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSE F. LEGASPI,** | Case No. 1:15-cv-00844 DAD MJS (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| **RON BARNES, Warden,** | |
| Respondent. | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by Gary Huss, Esq. Respondent is represented by Max Feinstat of the office of the California Attorney General. Respondent declined magistrate judge jurisdiction. (ECF No. 9.)

## I.   Procedural Background

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Stanislaus, following his conviction by jury trial on May 2, 2012, for special circumstance murder with firearm and gang enhancements. (Clerk's Tr. at 270-71.) On July 20, 2012, Petitioner was sentenced to an indeterminate term of life without the possibility of parole. (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

District on December 24, 2012. (Lodged Doc. 6.) On May 1, 2014, the appellate court vacated and remanded the fees assessed to Petitioner, but otherwise affirmed the conviction. (Lodged Doc. 9.) Petitioner sought review by the California Supreme Court on June 9, 2014. (Lodged Doc. 12.) The petition for review was denied on July 9, 2014. (Lodged Doc. 13.)

Petitioner filed his federal habeas petition on June 3, 2015. (Pet., ECF No. 1.) Petitioner raised the following two claims for relief: (1) that the gang expert's recitation of testimonial hearsay violated Petitioner's rights under the confrontation clause, and (2) that the trial court abused its discretion in allowing the jury to hearsay evidence of Petitioner's past criminal conduct and those of alleged gang members.

Respondent filed an answer to the petition on October 5, 2015. (Answer, ECF No. 13.) Petitioner filed a traverse to the answer on October 27, 2015. (Traverse, ECF No. 15.)

## II.   Statement of Facts[1]

FACTUAL AND PROCEDURAL SUMMARY

The Information

The information charged Legaspi with a single count of first degree (willful, deliberate, and premeditated) murder (§§ 187, subd. (a), 189) and alleged the special circumstance of discharging a firearm from a vehicle at a person outside of the vehicle with the intent to inflict death. (§ 190.2, subd. (a)(21).) In addition, two enhancements were alleged: (1) Legaspi was a principal in the offense, another principal discharged a firearm, causing great bodily injury, and Legaspi violated section 186.22, subdivision (b), all within the meaning of section 12022.53, subdivision (e)(1), and (2) the crime was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b).

The Testimony

Ruben Lujano admitted at the time of the shooting he was "running with the Norteños." He also knew of Casper, who was a Sureño. He admitted that if he saw a "notorious Sureño" in Norteño territory, he would do what was necessary "to protect where you're from.... And your life may be at risk and you do what you have to do to keep breathing." Protecting

---

[1] The Fifth District Court of Appeal's summary of the facts in its May 1, 2014 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

gang territory is a primary objective of gangs, and a gang would use "any means necessary." When asked if the rivalry between the Norteños and Sureños was violent, Lujano repeated the refrain "by any means necessary." Lujano admitted gang members view the police and prosecutors as the enemy.

Lujano was a close friend of the victim Slefo. When questioned about the day Slefo was killed, Lujano stated he was drunk and did not remember what had occurred. He claimed he was so drunk he blacked out the event.

Kirk Bunch, a criminal investigator with the district attorney's office, interviewed Lujano the night of the shooting. Lujano had an odor of alcohol about him, but he did not appear intoxicated. He was cooperative and responded appropriately to Bunch's questions. The prosecution played the recording of Bunch's interview with Lujano for the jury.

In the interview Lujano admitted he was a member of the Norteño criminal street gang and had been since the fifth or sixth grade. He also admitted Slefo began "kicking it with all the homies" in junior high school.

Regarding the events that occurred the day of the shooting, Lujano explained he was with some "homegirls" who wanted to fight a girl that worked at a local fast-food restaurant (the employee) because she associated with Sureños. Lujano stated a Sureño should not work at that restaurant because it was in Norteño territory. Lujano went to the restaurant to warn the employee of a possible confrontation so she could arrange a safe ride home. Lujano left after warning her.

Lujano returned to the restaurant about 30 minutes later to buy some food. He was accompanied by some of his "homeboys." When Lujano left the restaurant, he saw a black car with "R.I.P. CASPER" written on the back window. The car contained Sureños and he had "never, ever see[n] Sureños there, never." Lujano assumed the employee had called the Sureños for protection. As the car passed by Lujano, the occupants started "yelling stuff" and throwing gang signs at him. Lujano called for assistance and "four or five homies just run out of nowhere and come through." Lujano and his associates ran towards the car. The car backed up, hitting a tree. Lujano tried to open the door, but the car drove off. As the car was leaving, Lujano heard someone say, "we'll be back."

Lujano and his associates then proceeded with their normal routine. A short while later, three cars filled with Sureños drove past Lujano. One of the cars parked nearby and turned off its lights. Eventually, the car left and Lujano began calling his associates because there was "a[n] issue." One of the individuals Lujano called was Slefo. Slefo arrived shortly after he was called.

As Lujano and his associates were milling around, a two-tone (green/tan) van drove by the group. Lujano ran when he saw the front passenger lean out of the window. He heard two gunshots. Lujano ran after the van, expecting Slefo to follow in his vehicle. When Slefo did not do so, Lujano returned to discover Slefo had been shot. Lujano described the man who shot Slefo as a bald Latino with a goatee and wearing a blue shirt.

Slefo suffered a gunshot wound to the chest that ruptured his aorta. Death occurred within minutes.

Andrew Garcia also was a member of the Norteño criminal street gang, a friend of Slefo's, and was present at the scene. Not surprisingly, he could not remember what occurred on the day of the shooting because he was excessively intoxicated.

Modesto Police Officer James Murphy interviewed Garcia shortly after the shooting. Garcia did not appear intoxicated, but did appear very angry. Garcia told Murphy he saw a dark minivan stop at the intersection of Lincoln and Japonica. Garcia saw a Hispanic male, about 25 years old, with a shaved head, goatee, and mustache, in the front passenger seat. Garcia described this person as a Sureño. The minivan made a left turn onto Lincoln. Moments later Garcia heard gunshots.

Ashley Noble spent most of the day with Slefo. Slefo received a phone call as he was driving Noble home that evening. Slefo quickly turned the vehicle around and drove very fast to the intersection of Lincoln and Yosemite. Slefo turned onto Lincoln and stopped his vehicle in the middle of the street. Slefo and Noble walked over to a group of Slefo's friends, whom Noble was not able to identify. After a few minutes, Slefo and Noble returned to the vehicle and Slefo parked a short distance away. Slefo told Noble to stay in the vehicle as he again exited the vehicle.

After about five minutes, Noble sent a text message to Slefo stating that she wanted to leave because she was frightened. Slefo, whom Noble could see from the vehicle, put his hand up and told her to wait. Slefo walked towards Noble but then stopped in front of his vehicle. Noble saw a green van driving down the street. Noble identified a picture of Legaspi's mother's van (exhibit No. 2) as the van she observed that day. She did not see any of the occupants in the van, nor did she hear anything said by the occupants in the van. About midway through the intersection, Noble heard gunshots coming from the front passenger seat of the van. Slefo fell down and then ran to the back of his vehicle.

On the day of the shooting, Chae Angelino was in a relationship with Lujano. Sometime that afternoon, Angelino, Lujano, and two or three other people were walking to a fast-food restaurant when they saw a black Mazda with "R.I.P. CASPER" written on the back window. When Lujano saw the vehicle, he yelled something at the vehicle in an angry tone, and then ran towards the vehicle. Lujano opened the driver's door, but the vehicle backed up, hit a tree, and then quickly drove off.

About 30 minutes later Angelino again saw the black Mazda in the neighborhood. The Mazda drove onto Lincoln and stopped in the street about one block away. After about two minutes the Mazda drove away.

Later that day the group with Lujano and Angelino grew in size. Angelino was apprehensive that something was going to happen. Slefo arrived with Noble. Slefo greeted Lujano and then the two of them walked "back and forth on the street." A short while later a green van with a sliding door drove down the street. The passenger in the front seat yelled profanities at Angelino. The green van then turned left onto Lincoln towards Yosemite.

4

About 20 to 30 minutes later the green van returned and again stopped at the intersection of Japonica and Lincoln. Angelino observed only a driver and passenger in the van. The green van again turned left onto Lincoln from Japonica. Angelino heard two gunshots. Angelino called for emergency services.

Amanda Jones, Angelino's sister, testified she was with her sister on the day of the shooting. Her testimony was similar to Angelino's. Regarding the incident at the fast-food restaurant, however, she identified Legaspi as the driver of the Mazda and testified that as he drove off he said, "We'll be back, bitches" in an angry tone.

Legaspi was interviewed by the police, and a recording of the interview was played for the jury. The majority of the interview was not relevant to the issues at trial. In the relevant portions, Legaspi stated he did not want to be in the gang anymore because it was "stupid." He joined the gang in junior high school when he decided who his real friends were. But this was before they started getting into drugs and things. Now, Legaspi did not think it was "worth it." He denied associating with gang members anymore, claiming he went from home to work to school and then back home.

Regarding the shooting, Legaspi admitted the incident at the fast-food restaurant in a similar fashion as the other witnesses, but he denied being at the scene of the shooting. He denied going to the restaurant because of possible trouble between the employee and Norteños, claiming he went because his cousins wanted to buy some food. He claimed he did not know why the Norteños attacked his vehicle. He drove home from the restaurant, but he never spoke with Jose Nunez, the suspected shooter. Legaspi's sister then gave him a ride to his friend Jaime Hernandez's house.

Legaspi recognized a picture of his mother's van when the interviewing officer presented it to him. Legaspi also admitted "It was a good day for a Sureño to kill a Norteño and would give him bragging rights" because Casper recently had been murdered. When shown a picture of Nunez, Legaspi said he did not know if Nunez was the individual who shot Slefo.

A warrant was issued for Legaspi's arrest the day after the interview. All initial attempts to locate Legaspi failed. Legaspi failed to appear at work when he was scheduled to do so and could not be located at school. Approximately two years later, Legaspi was arrested when he attempted to enter the United States from Mexico.

Legaspi presented three witnesses in his defense his sister Soledad Legaspi, Hernandez's girlfriend Beatriz Ramos, and Hernandez's sister Mari Carmen Lopez. Each testified Legaspi was at a party at Hernandez's house the night of the shooting. Each also claimed Hernandez either was not in a gang or they did not know if he was in a gang, despite his extensive gang tattoos.

Philip Owen, the lead investigating detective, testified Legaspi was wearing a blue belt when he was arrested. The belt buckle was silver and had the letter "S" on it. Owen showed Jones a photo lineup and she identified Legaspi as the driver of the black Mazda at the restaurant. Owen

showed Lujano a different photo lineup in which Lujano identified Nunez as the one who shot Slefo. Jones was then shown the same lineup as that presented to Lujano, but she was not able to identify anyone. Angelino also was shown the lineup and tentatively identified Nunez as the person who shot Slefo.

Deputy Sheriff Raymond Harper testified that during the trial he left Legaspi in a corridor for a short time before transporting him to the courtroom. After he transported Legaspi to the courtroom, Harper discovered gang graffiti ("ESS" and "X3") written on the wall where Legaspi had been standing.

Gumm testified as the prosecution's criminal street gang expert. Gumm testified there were at least 15 to 20 members in the East Side Sureño (ESS) criminal street gang at the time of the shooting and approximately 500 members of the Sureño criminal street gang in Modesto. Gumm identified the primary criminal activities of the Sureño criminal street gang as murders, attempted murders, violent assaults, drive-by shootings, assaults with deadly weapons, theft-related crimes, narcotic sales, and vandalism. Gumm identified the belt Legaspi was wearing when he was arrested as representative of the Sureño criminal street gang and identified the van depicted in exhibit No. 2, which was identified as the van used in the shooting, as belonging to Legaspi's mother. Gumm had seen Legaspi in the van several times. Gumm opined Legaspi was a member of the East Side Sureño criminal street gang.

Gumm testified photos depicting the neighborhood in which the shooting occurred contained items on which gang graffiti representative of the Norteño criminal street gang had been painted. This graffiti was an indication the Norteños claimed the area as their territory. Gang members from different gangs knew that if they ventured into Norteño territory they would be met with violence because their mere presence would be a sign of disrespect.

Gumm testified the events leading to the shooting were intended to, and had the effect of, disrespecting the opposing gangs. As a result, both gangs expected a violent response. Gumm explained Casper was killed in a gang-related shooting at his residence. Casper was considered a leader of the East Side Sureño criminal street gang. In response to a hypothetical question, Gumm opined the shooting was in retaliation for the shooting of Casper, and thus for the benefit of, or in association with, a criminal street gang.

Closing Argument

The prosecution argued the combination of the murder of Casper, along with the confrontation at the fast-food restaurant shortly before the murder, incited Legaspi. According to the prosecution's theory, Legaspi drove home, switched to a vehicle the Norteños would not recognize (Legaspi's mother's vehicle), and returned to exact revenge. The prosecution theorized Legaspi was the driver of the van and that Nunez shot Slefo.

Legaspi argued the van used in the shooting was not his mother's van, and the witnesses he called provided him with an alibi for the time of the shooting.

<u>The Verdict and Sentencing</u>

The jury convicted Legaspi of first degree murder and found the special circumstance and the enhancements to be true. Legaspi was sentenced to a term of life without the possibility of parole, enhanced by a term of 25 years to life for the firearm enhancement.

<u>People v. Legaspi</u>, 2014 Cal. App. Unpub. LEXIS 3176, 3-15 (May 1, 2014).

## II.   Discussion

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.   Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

7

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

   1. <u>Contrary to or an Unreasonable Application of Federal Law</u>

  A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" <u>Musladin v. Lamarque</u>, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." <u>Id.</u> at 75-76, quoting <u>Williams</u>, 529 U.S. at 409-10; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002). In <u>Harrington v. Richter</u>, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing <u>Williams</u>, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Id.</u> at 786 (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." <u>Id.</u>; <u>Renico v. Lett</u>, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

1   Federal law for a state court to decline to apply a specific legal rule that has not been

2   squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

3   (2009), quoted by Richter, 131 S. Ct. at 786.

4              **2.     Review of State Decisions**

5        "Where there has been one reasoned state judgment rejecting a federal claim,

6   later unexplained orders upholding that judgment or rejecting the claim rest on the same

7   grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

8   "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

9   (9th Cir. 2006).  Determining whether a state court's decision resulted from an

10  unreasonable legal or factual conclusion, "does not require that there be an opinion from

11  the state court explaining the state court's reasoning."  Richter, 131 S. Ct. at 784-85.

12  "Where a state court's decision is unaccompanied by an explanation, the habeas

13  petitioner's burden still must be met by showing there was no reasonable basis for the

14  state court to deny relief."  Id. ("This Court now holds and reconfirms that § 2254(d) does

15  not require a state court to give reasons before its decision can be deemed to have been

16  'adjudicated on the merits.'").

17       Richter instructs that whether the state court decision is reasoned and explained,

18  or merely a summary denial, the approach to evaluating unreasonableness under §

19  2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

20  or theories supported or, as here, could have supported, the state court's decision; then

21  it must ask whether it is possible fairminded jurists could disagree that those arguments

22  or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

23  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

24  was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

25  authority to issue the writ in cases where there is no possibility fairminded jurists could

26  disagree that the state court's decision conflicts with this Court's precedents."  Id.  To put

27  it yet another way:

28             As a condition for obtaining habeas corpus relief from a federal

9

court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3.    Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002). Musalin v. Lamarque, 555 F.3d at 834.

### III.    Review of Petition

#### A.    Claim One: Expert Testimony Violated Confrontation Clause

Petitioner claims that the gang expert's recitation of testimonial hearsay violated the Confrontation Clause.

##### 1.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

appellate court and summarily denied in a subsequent petition for review by the California Supreme Court. Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the California Court of Appeal explained:

DISCUSSION

I. Gang Evidence

Legaspi's initial arguments are directed at the evidence related to his membership in a criminal street gang. First, Legaspi asserts the trial court erred when it refused to limit the number of gang-related incidents to which Gumm testified when providing the basis for his opinion that Legaspi was a member of the East Side Sureño criminal street gang. Second, Legaspi argues his constitutional right to confront witnesses was violated when Gumm relied on multiple levels of hearsay in forming his opinion.

We begin with the purpose of Gumm's testimony. The prosecution alleged a section 186.22, subdivision (b) enhancement. This section provides for increased punishment if in addition to proving the defendant committed a felony, the prosecution proves (1) the crime was committed for the benefit of a criminal street gang, or in association with a criminal street gang, or at the direction of a criminal street gang, and (2) the crime was committed with the specific intent to promote, or further, or assist in any criminal conduct by members of a criminal street gang. A "criminal street gang" is defined as (1) a group of three or more persons, (2) having as one it its primary activities the commission of one or more enumerated criminal offenses, (3) which has a common name, sign or symbol, and (4) whose members either individually or collectively engage in a pattern of criminal gang activity. (Id., subd. (f).) A "pattern of criminal gang activity" is defined as the commission, attempted commission, or conspiracy to commit two or more of the enumerated criminal offenses, one of which must have occurred after the effective date of the statute and the other of which must have occurred within three years of a prior offense. (Id., subd. (e).) The offenses must have occurred on separate occasions or must have been committed by two or more individuals. (Ibid.)

## The Testimony

To understand Legaspi's argument fully, we begin with the parameters of expert testimony, which encompasses all of the objectionable material on which Legaspi focuses. Expert testimony is permissible when it is "Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) The issues raised by Legaspi concern the information an expert may relate to the jury to support his or her opinion.

"'Expert testimony may ... be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. [Citations.] ... [¶] ... And because Evidence Code section 802 allows an expert witness to "state on direct examination the reasons for his opinion and the matter ... upon which it is based," an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.] [¶] A trial court, however, "has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay." [Citation.] A trial court also has discretion "to weigh the probative value of inadmissible evidence relied upon by an expert witness ... against the risk that the jury might improperly consider it as independent proof of the facts recited therein." [Citation.]' [Citation.]

"'Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.] [¶] Sometimes a limiting instruction may not be enough. In such cases, Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. [Citation.]' [Citation.]" (People v. Bell (2007) 40 Cal.4th 582, 608.)

Gumm was called as an expert witness to establish each of the elements of the section 186.22, subdivision (b) enhancement. In addition, his testimony was intended to educate the jury about gang culture and to explain the motive for this otherwise senseless murder. The testimony to which both of Legaspi's arguments are directed relates to numerous contacts Legaspi had with law enforcement.

The first incident occurred on July 23, 2004, when Legaspi was in a vehicle with two other members of the Sureño criminal street gang.

The second incident occurred on June 4, 2006, when Legaspi again was found to be in the company of several other gang members, including Casper.

The third incident occurred on October 31, 2006. Sheriff's deputies responded to reports of a fight. Deputies arrived to find Legaspi holding a

baseball bat. The two individuals who claimed to be victims were wearing red shirts. These individuals asserted Legaspi and another individual were driving around yelling gang slogans at the alleged victims. At one point Legaspi exited the vehicle and struck the alleged female victim in the face several times. Legaspi then returned to the vehicle and fled the scene. The alleged victims' family members then searched for Legaspi. They found him and another fight occurred. According to the alleged victims, Legaspi obtained a baseball bat and tried to strike one of the family members. The family member took the bat from Legaspi and struck Legaspi with it, apparently breaking Legaspi's arm. Legaspi admitted to confronting the alleged victims but denied hitting the female victim. The second confrontation occurred when the family members struck Legaspi with a baseball bat, which he eventually was able to take from them.

The fourth incident occurred on February 15, 2007. In this incident someone, apparently Norteños, threw a Molotov cocktail in the driveway of Legaspi's home. Shortly thereafter, two individuals drove by slowly in a vehicle. Legaspi, apparently believing the two were Norteños, shot at the vehicle. A search of Legaspi's home recovered two handguns. In addition, numerous items related to the Sureño criminal street gang were found in Legaspi's room. Legaspi's sister, Soledad, told investigators Legaspi associated with the Sureño criminal street gang, and she believed the incident was gang related. The prosecution introduced a certified copy of the conviction for assault with a deadly weapon, including a gun use enhancement as one of the convictions necessary to establish a pattern of criminal activity.

The fifth incident occurred on March 17, 2008. After being stopped for a traffic violation, Legaspi admitted to officers that he "hangs out" with Sureños.

The sixth and seventh incidents were related. The sixth incident occurred on October 5, 2008, when someone in a group of males shot at Legaspi's vehicle as Legaspi drove by. Legaspi reported the incident and asserted the perpetrators were Norteños. Legaspi stated he was friends with several members in the group until their gang involvement came between them. Also present in Legaspi's vehicle at the time was Hernandez. The seventh incident occurred on October 24, 2008, when three Norteños came to Legaspi's house and began yelling gang slogans at him in an attempt to prevent him from testifying about the October 5 shooting incident. The three Norteños were arrested for witness intimidation.

The eighth incident occurred on March 17, 2009, the day of Casper's funeral. Legaspi was in a vehicle stopped for a traffic violation. In the vehicle with Legaspi were three members of the Sureño criminal street gang. Legaspi was wearing a blue shirt, and one individual was wearing a shirt that read "R.I.P. CASPER." Legaspi admitted the four were on their way to Casper's funeral.

The ninth incident occurred at the interment ceremony for Casper. When Legaspi arrived at the cemetery, a group of young men, all wearing blue shirts, left the ceremony and went directly to Legaspi's vehicle. Legaspi was seen talking to the group when they arrived, as if giving directions to the group.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The last incident occurred on September 22, 2009, several months after Casper and Slefo were murdered. According to witness statements, Legaspi was driving a van when he passed a Norteño gang member walking to a store. The Norteño gang member flashed a gang sign at Legaspi. Legaspi turned the vehicle around and attempted to strike the Norteño gang member with the vehicle. One of the occupants of the van exited with a baseball bat. The Norteño gang member ran into the store for his safety. Investigating officers found on Legaspi's phone text messages referring to Norteño gang members in a derogatory manner and suggesting a need to get some guns.

During and after Gumm's testimony, the trial court instructed the jury that this hearsay matter could be used only to evaluate Gumm's opinions, and not for the truth of the matters stated.

…

Confrontation Clause

Legaspi's second argument concerning this evidence was that Gumm presented extensive inadmissible hearsay as a basis for his opinions. Legaspi contends that introduction of these hearsay statements violated his Sixth Amendment right to confront all witnesses against him. In Crawford v. Washington (2004) 541 U.S. 36 (Crawford), the Supreme Court held the Sixth Amendment requires the declarant be unavailable for trial and subject to a prior opportunity to be cross-examined before hearsay evidence that is testimonial in nature is admitted in a trial. (Crawford, at p. 68.) Crawford declined to provide the parameters to determine when a statement is "testimonial" other than to note a statement given to police during their investigation was indeed testimonial. (Id. at p. 53 [interrogations by law enforcement officers are testimonial].)

The Supreme Court revisited the question of when a statement is testimonial in Davis v. Washington (2006) 547 U.S. 813 (Davis). While not providing an all-encompassing definition, the Supreme Court held: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Id. at p. 822.) In a footnote, the Supreme Court explained its holding referred to interrogations because that was the issue presented by the case. "This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial…. And of course even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." (Id. at fn. 1.) The Supreme Court explained the statements at issue in Crawford clearly were testimonial because they were obtained in a police interrogation "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." (Davis, at p. 826.)

The issue in Davis was whether statements made to a 911 emergency services operator were testimonial. The Supreme Court

14

distinguished <u>Crawford</u> by noting the "initial interrogation conducted in connection with a 911 call[] is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (<u>Davis</u>, *supra*, 547 U.S. at p. 827.) Because the statements were made as events were happening, the caller was facing an ongoing emergency, the statements were elicited to resolve the present emergency, and the informal setting in which the statements were obtained established the statements were not testimonial because the primary purpose of the statements were to enable law enforcement to provide assistance in an ongoing emergency. (<u>Id.</u> at pp. 827-828.)

The Supreme Court distinguished the statements made in <u>Hammon v. Indiana</u>, No. 05-5705, which had been consolidated with <u>Davis</u>. Police in <u>Hammon</u> responded to a reported domestic disturbance. The wife was found on the front porch of the residence and stated nothing was the matter. When the officers entered the residence, they found a broken heating unit and the husband in the kitchen. The husband admitted an argument had occurred, but denied there had been a physical confrontation. The wife, on further questioning, admitted she had been struck by her husband and filled out an affidavit stating she had been abused by her husband. (<u>Davis</u>, *supra*, 547 U.S. at pp. 819-820.) Noting the similarity to <u>Crawford</u>, the Supreme Court concluded the statements were part of an investigation into past criminal conduct and thus were testimonial. (<u>Davis</u>, at pp. 829-830.)

This issue again was revisited by the Supreme Court in <u>Michigan v. Bryant</u> (2011) 562 U.S. [131 S.Ct. 1143]. Bryant was convicted of shooting the victim. Police responded to the location of the victim and discovered he had been shot in the abdomen. The victim told officers he had been at Bryant's home and had been shot through the back door. After being shot, he got in his car and drove to a gas station where officers found him. (<u>Id.</u> at p. [131 S.Ct. at p. 1150].) Applying the test in <u>Davis</u>, the Supreme Court concluded the statements were not testimonial because an objective view of the totality of the circumstances established the primary purpose of the interrogation was to respond to an ongoing emergency. (<u>Bryant</u>, at p. [131 S.Ct. at pp. 1162-1167].)

In <u>People v. Cage</u> (2007) 40 Cal.4th 965 (<u>Cage</u>), the California Supreme Court addressed the confrontation clause issue. It concluded a victim's statements to police were testimonial because they were in response to focused police questioning, whose primary purpose was to investigate the circumstances of a crime or prove some past fact. (<u>Id.</u> at p. 970.) On the other hand, the victim's statements to the treating physician describing how he was injured were deemed nontestimonial because the primary purpose of the physician's general questions was to deal with the treatment of the victim and the questions were not designed to identify the perpetrator or to be used in court. (<u>Ibid.</u>)

Reviewing United States Supreme Court precedent, the California Supreme Court "derived several basic principles" to be used to determine whether the Sixth Amendment applies to proposed hearsay testimony:

> "First, as noted above, the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the

testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (Cage, supra, 40 Cal.4th at p. 984, fns. omitted.)

The California Supreme Court summarized Crawford, Davis, and Bryant in People v. Blacksher (2011) 52 Cal.4th 769 (Blacksher): "It is the 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause. [Citation.] Consequently, if a statement is not offered for its truth, or is nontestimonial in character, the confrontation clause is not a bar to admission. Thus, the touchstone questions are whether a statement is hearsay offered against a criminal defendant, whether the statement is otherwise admissible under a hearsay exception, and, if so, whether the statement is testimonial." (Blacksher, at p. 813.) The California Supreme Court also identified six factors to be considered when determining whether the primary purpose of both the declarant and the investigating officer was to create an out-of-court substitute for trial testimony: (1) the circumstances of the encounter, (2) whether an ongoing emergency existed, although the lack of an emergency does not necessarily make a statement testimonial, (3) the circumstances of the emergency, if one existed, (4) the medical condition of the declarant, (5) the status of the emergency when the statement was obtained, and (6) the informality of the statement and the circumstances of its acquisition. (Id. at pp. 814-815.)

The California Supreme Court applied these factors to evaluate statements made to police officers. The declarant had spoken to officers at her house, where her daughter and grandson had been shot. She told officers that Blacksher, her son, had shot the victims. The responding officer spoke with the declarant for approximately 15 minutes. The officer asked questions about the shooting, including questions related to Blacksher's current location. The officer learned Blacksher was not at the house so the officers suspected the shooter had fled. It also was reasonable to presume Blacksher was armed with the firearm used in the murders. The Supreme Court observed the declarant was visibly upset, and the interview occurred in the front yard of declarant's home, with a neighbor present, under chaotic conditions. (Blacksher, supra, 52 Cal.4th at pp. 816-817.) The Supreme Court concluded it was objectively reasonable for the officers to believe an armed perpetrator remained at large and presented an emergency situation. "Objectively, the primary

16

purpose of both [the declarant] and [the officer] was to deal with that emergency, not to create an out-of-court substitute for trial testimony. Instead, the primary purpose for both of them was to determine defendant's whereabouts and evaluate the nature and extent of the threat he posed." (Id. at p. 816.)

It is sufficient for the purposes of this case to observe the confrontation clause is implicated only when a statement is hearsay (an out-of-court statement offered for the truth of the matter asserted), and the primary purpose for obtaining the statement is to prove some fact for use at a criminal trial (a substitute for trial testimony). (Davis, supra, 547 U.S. at pp. 822, 827; Crawford, supra, 541 U.S. at pp. 53, 68; Blacksher, supra, 52 Cal.4th at pp. 813-815; Cage, supra, 40 Cal.4th at p. 984.)

Legaspi asserts three of the incidents to which Gumm testified violated his right to confront the witnesses against him. The first such instance occurred on July 23, 2004, when Legaspi was observed in a vehicle with two other gang members. At the time of the contact, none of the individuals admitted they were members of a gang. On a later occasion, however, the two men with Legaspi admitted they were gang members at the time they were with Legaspi. Legaspi argues that Gumm's testimony that the other two occupants of the vehicle admitted they were gang members was hearsay and violated Crawford.

Legaspi's argument fails because the statements were not hearsay. Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted. (Evid. Code, § 1200, subd. (a).) Gumm's testimony about statements made by the other two occupants in the vehicle related an out-of-court statement. As the jury repeatedly was instructed, however, the statements were not offered to prove the occupants were gang members, but to establish the basis for Gumm's opinion. Accordingly, the statements were not hearsay, and Crawford does not apply. (Blacksher, supra, 52 Cal.4th at p. 813.) Moreover, there is no evidence that at the time the statements were made, they were obtained as a substitute for trial testimony in the prosecution of Legaspi or anyone else. Simply stated, Legaspi's right to confront the witnesses against him was not implicated.

The second incident occurred on October 31, 2006, when Legaspi confronted two other gang members, allegedly striking a woman in the face several times, and ended with Legaspi suffering a broken arm when he was struck with a baseball bat. Gumm related two versions of the events that day — one provided by the Norteños and the other provided by Legaspi. The Norteños asserted Legaspi was the instigator of the confrontation, while Legaspi blamed the Norteños. Legaspi also denied hitting the woman in the face. Each version was provided to a police officer other than Gumm, and Gumm apparently obtained his view of the events from police reports.

Legaspi again asserts the statements were offered for their truth. We, once again, disagree. Gumm testified to both versions of the confrontation, not giving either more weight than the other. From the testimony it would not appear either party was charged with a crime. The jury would have understood Gumm was not asserting either version of the confrontation was true, and the import of the events was that a confrontation occurred involving Norteños and Legaspi, supporting Gumm's opinion. While Legaspi may be arguing that a confrontation

occurred was the "truth" offered by Gumm, we disagree. The reports on which Gumm relied provided information to allow him to form an opinion in the case, and not for proof the altercation occurred.

The third incident occurred on September 22, 2009, and involved an allegation that Legaspi attempted to hit with his vehicle a Norteño who flashed a gang sign as Legaspi drove by. The window on Legaspi's vehicle was broken, and someone from the van (not Legaspi) jumped out of the van with a baseball bat and ran after the Norteño. The basis for this information appears to be a police report or other document prepared by someone other than Gumm. Once again, this incident was not offered to prove the confrontation occurred, but to establish the basis for Gumm's opinion. Accordingly, the statement was not hearsay and the confrontation clause was not implicated.

We recognize that if these events never occurred, i.e., if Gumm fabricated these incidents, there would be no basis for his opinion and it would not be entitled to any weight. Also, their relevance requires they be true. But the purpose of explaining the foundation for an expert's opinion is to permit the opposing party, in this case Legaspi, to attack the expert's opinion by showing the foundation is unreliable and thus the expert's opinion is entitled to no weight. There was no showing the information on which Gumm relied was unreliable, and numerous cases have established that such information is the type on which experts in this area rely. (See, e.g., People v. Gardeley (1996) 14 Cal.4th 605, 617-620.)

We also recognize the argument that the jury must, inevitably, accept the hearsay statements to which the expert testifies as true, despite the jury instruction informing them to not do so. (People v. Hill (2011) 191 Cal.App.4th 1104, 1129-1130 (Hill).) Hill cited People v. Goldstein (2005) 6 N.Y.3d 119 (Goldstein) to demonstrate the incongruity between the assertion the hearsay statements are not offered for their truth but simply to provide a basis for the expert's opinion, with the obviously true premise that if the hearsay statements are not true, they cannot provide any support for the expert's opinion. In Goldstein the defendant murdered a woman by pushing her into the path of an oncoming subway train. He defended against the charges by claiming he was insane. The prosecution called psychiatrist Angela Hegarty to rebut Goldstein's expert witnesses. Hegarty was permitted to testify to various statements made by people she interviewed while investigating the incident to help form her opinion. Goldstein argued his right to confront witnesses was violated by the introduction of these statements. The appellate court agreed.

"The claim that the interviewees' statements to Hegarty were not hearsay is based on the theory that they were not offered to prove the truth of what the interviewees said. Hearsay is 'a statement made out of court ... offered for the truth of the fact asserted in the statement' [citations]. The Supreme Court said in Crawford that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted' [citation]. Here, according to the People, the interviewees' statements were not evidence in themselves, but were admitted only to help the jury in evaluating Hegarty's opinion, and thus were not offered to establish their truth.

18

"We find the distinction the People make unconvincing. We do not see how the jury could use the statements of the interviewees to evaluate Hegarty's opinion without accepting as a premise either that the statements were true or that they were false. Since the prosecution's goal was to buttress Hegarty's opinion, the prosecution obviously wanted and expected the jury to take the statements as true. Hegarty herself said her purpose in obtaining the statements was 'to get to the truth.' The distinction between a statement offered for its truth and a statement offered to shed light on an expert's opinion is not meaningful in this context. (See Kaye et al., The New Wigmore: Expert Evidence § 3.7, at 19 [Supp 2005] ['(T)he factually implausible, formalist claim that experts' basis testimony is being introduced only to help in the evaluation of the expert's conclusions but not for its truth ought not permit an end-run around a Constitutional prohibition'].) We conclude that the statements of the interviewees at issue here were offered for their truth, and are hearsay." (Goldstein, supra, 6 N.Y.3d at pp. 127-128.)

We agree with Hill, however, that established California law, including Supreme Court cases, compels us to follow Gardeley and its progeny, even in the face of this dichotomy, however compelling the argument may be. (Hill, supra, 191 Cal.App.4th at p. 1131; see also Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

People v. Legaspi, 2014 Cal. App. Unpub. LEXIS 3176 at 35-50.

## 2.    Applicable Law

The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Fenenbock v. Director of Corrections for California, 692 F.3d 910 (9th Cir. 2012) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). The Confrontation Clause applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The

1    _Crawford_ rule applies only to hearsay statements that are "testimonial" and does not bar

2    the admission of non-testimonial hearsay statements. Id. at 42, 51, 68. See also

3    Whorton v. Bockting, 549 U.S. 406, 420, 127 S. Ct. 1173, 167 L. Ed. 2d 1 (2007) ("the

4    Confrontation Clause has no application to" an "out-of-court nontestimonial statement.").

5            Although the Crawford court declined to provide a comprehensive definition of the

6    term "testimonial," it stated that "[s]tatements taken by police officers in the course of

7    interrogations are . . . testimonial under even a narrow standard." Crawford, 541 U.S. at

8    52. The court also provided the following "formulations" of a "core class" of testimonial

9    statements: (1) "ex parte in-court testimony or its functional equivalent - that is, material

10   such as affidavits, custodial examinations, prior testimony that the defendant was unable

11   to cross-examine, or similar pretrial statements that declarants would reasonably expect

12   to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized

13   testimonial materials, such as affidavits, depositions, prior testimony, or confessions;"

14   and (3) "statements that were made under circumstances which would lead an objective

15   witness reasonably to believe that the statement would be available for use at a later

16   trial." Id. at 51-52. The court in Crawford also pointed out that the Sixth Amendment

17   Confrontation Clause "does not bar the use of testimonial statements for purposes other

18   than establishing the truth of the matter asserted." Id. at 59, n.9. However, "state

19   evidence rules do not trump a defendant's constitutional right to confrontation," and a

20   reviewing court "ensures that an out-of-court statement was introduced for a 'legitimate,

21   nonhearsay purpose' before relying on the not-for-its-truth rationale to dismiss the

22   Confrontation Clause's application." (citation omitted). Williams v. Illinois, 132 S.Ct.

23   2221, 2226, 183 L. Ed. 2d 89 (2012).

24           Even should a Confrontation Clause violation occur, it is subject to harmless error

25   analysis. Whelchel v. Washington, 232 F.3d 1197, 1205-06 (9th Cir. 2000). "In the

26   context of habeas petitions, the standard of review is whether a given error 'had

27   substantial and injurious effect or influence in determining the jury's verdict.'" Christian v.

28   Rhode, 41 F.3d 461, 468 (9th Cir. 1994) (quoting Brecht v. Abrahamson, 507 U.S. 619,

637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)). Factors to be considered when assessing the harmlessness of a Confrontation Clause violation include the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case. <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

### 3.   Analysis

In this case, the Court of Appeal reasonably determined under established Supreme Court authority that no Confrontation Clause violation occurred. Even if the statements were hearsay, the state court reasonably determined that Officer Gumm's testimony regarding the underlying facts of the predicate offenses did not constitute "testimonial statements" and did not violate the Confrontation Clause. The court found the testimony was not offered for the truth but to explain the basis of Gumm's opinions — a limited use which was permissible under <u>Crawford</u> and <u>Williams</u>. Gumm applied his training and experience to the sources of information before him, including the substance of police reports, in reaching an independent judgment that the individuals who committed the predicate offenses were members of the Sureño criminal street gang and that a primary activity of the Sureño gang included the commission of murders, attempted murders, violent assaults, drive-by shootings, assaults with deadly weapons, theft-related crimes, narcotic sales, and vandalism. <u>See</u> <u>People v. Legaspi</u>, 2014 Cal. App. Unpub. LEXIS 3176 at 35-50.

The Ninth Circuit has held under <u>Crawford</u> that where a gang expert testifies and applies his training and experience to the sources before him and reaches an independent judgment, his testimony complies with the Confrontation Clause. <u>See</u> <u>United States v. Vera</u>, 770 F.3d 1232 (9th Cir. 2014). Moreover, the trial court instructed the jury that it was not to consider the underlying facts of the predicate offenses for the truth, and instead that they were only a basis for Gumm's opinions. <u>People v. Legaspi</u>, 2014 Cal. App. Unpub. LEXIS 3176 at 35-50; Rep. Tr. at 394; 405-410. The jury is

1    presumed to have followed such instructions. See Weeks v. Angelone, 528 U.S. 225,

2    226, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000) (jury presumed to follow judge's

3    instructions).

4          In light of the foregoing, Gumm's reliance on police reports and lack of personal

5    knowledge regarding the predicate offenses did not deprive Petitioner of a meaningful

6    opportunity to cross-examine Paris and did not violate the Confrontation Clause. The

7    California Court of Appeal's rejection of Petitioner's Confrontation Clause claim was not

8    contrary to, and did not involve an unreasonable application of, clearly established

9    Supreme Court law, and was not based on an unreasonable determination of the facts in

10   light of the evidence presented.

11         Although not raised by Petitioner, the Court notes that in denying his petition for

12   review, the California Supreme Court explained that the denial was without prejudice to

13   any relief to which defendant might be entitled after the court decided People v.

14   Sanchez, S216681. (Lodged Doc. 13.) On June 30, 2016, the California Supreme Court

15   decided People v. Sanchez, 63 Cal. 4th 665, 374 P.3d 320 (2016), in which it held that

16   "case-specific statements" related by a prosecution expert concerning a defendant's

17   gang membership may constitute inadmissible hearsay where the expert presents them

18   as true statements of fact without the requisite independent proof. It determined that

19   such inadmissible statements violate the Confrontation Clause if the hearsay is

20   testimonial, unless there is a showing of unavailability and the defendant had a prior

21   opportunity for cross-examination or forfeited that right. Sanchez, 63 Cal. 4th at 677. It

22   did "not call into question the propriety of an expert's testimony concerning background

23   information regarding his knowledge and expertise and premises generally accepted in

24   the field." Id. at 685. Although Petitioner may be eligible for relief in state court, Sanchez

25   does not alter the Court's view that Petitioner is not entitled to federal habeas relief in

26   this case.

27         First, the California Supreme Court's foregoing determination of federal

28   constitutional law does not constitute "clearly established Federal law, as determined by

the Supreme Court of the United States" (28 U.S.C. § 2254(d)) and is not binding on this Court. Further, even assuming that <u>Sanchez</u> was binding on this Court, the Court would find that the admission of the testimony of the gang expert was harmless, and that any failure by petitioner's counsel to object to any such testimony did not prejudice Petitioner.

Although Gumm's opinion partially relied on third party investigatory reports, Petitioner only challenged three of the ten incidents upon which Gumm relied upon to reach his opinion. Accordingly, even if improperly admitted, in light of the other evidence presented, it was unlikely to have influenced the jury's decision. <u>Delaware v. Van Arsdall</u>, 475 U.S. at 684. In addition to the prior incidents described by Gumm, other testimony provided evidence of Petitioner's gang affiliation and would serve as circumstantial evidence to support the gang enhancement. For example, Sheriff Harper testified at trial that he found gang graffiti in a hallway where he had left Petitioner. <u>People v. Legaspi</u>, 2014 Cal. App. Unpub. LEXIS 3176, 3-15. Also, when Petitioner was interviewed after the crime, he stated that he joined the gang in junior high school and did not want to be in the gang anymore, and was not associating with gang members. He denied being involved in the shooting, but admitted "It was a good day for a Sureño to kill a Norteño and would give him bragging rights" in retaliation for Casper's murder. <u>Id.</u> Based on the other evidence presented of Petitioner's gang involvement, including his own statements that he was a gang member, it is unlikely that jurors would have not found Petitioner guilty of the gang enhancement even if the testimonial statements of Officer Gumm were found inadmissible under <u>Crawford</u>. Based the large amount of gang evidence presented, and the overall strength of the prosecution's case, an error in allowing the testimony was harmless. <u>Delaware v. Van Arsdall</u>, 475 U.S. at 684. The trial court's error in allowing the statements did not have a substantial or injurious effect or influence in determining the jury's verdict. <u>Christian v. Rhode</u>, 41 F.3d at 468.

Thus, the Court concludes that the state courts' denial of this claim was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it an unreasonable

determination of the facts. See 28 U.S.C. § 2254(d). It is therefore recommended that Petitioner is not entitled to habeas relief on this claim.

While Petitioner is not entitled to federal habeas relief, the Court must reiterate that Petitioner may be eligible for relief in state court in light of the recent California Supreme Court decision in People v. Sanchez, 63 Cal. 4th 665, 374 P.3d 320 (2016). This Court is bound to apply federal law, and under AEDPA must only apply clearly established federal law as determined by the United States Supreme Court. However, it is noted that the California Fifth District Court of Appeal, the relevant state court with jurisdiction over Petitioner's appeal, has granted the relief to Confrontation Clause claims based on Sanchez. See e.g., People v. Medrano, 2016 Cal. App. Unpub. LEXIS 7890 (Cal. App. 5th Dist. Oct. 27, 2016); People v. Givens, 2016 Cal. App. Unpub. LEXIS 7913 (Cal. App. 5th Dist. Nov. 3, 2016).

### B.    Claim Two – Admission of Gang Evidence Prejudicial

Petitioner next contends the trial court abused its discretion in admitting Petitioner's past criminal acts and the actions of other gang members.

### 1.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 1-4.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

Limitation of Evidence

Legaspi's first argument focuses on three of the above incidents: (1) the October 31, 2006, incident where Legaspi apparently attacked two Norteños, striking one woman in the face several times; (2) the February 15, 2007, incident where Legaspi retaliated for someone throwing a Molotov cocktail in his driveway by shooting at a passing vehicle he

believed contained Norteños; and (3) the September 22, 2009, incident where Legaspi attempted to strike with his vehicle a member of the Norteño criminal street gang.

Legaspi contends the trial court abused its discretion under Evidence Code section 352 in admitting this evidence because its probative value was substantially outweighed by its prejudicial effect. Legaspi points to the extensive evidence of his gang membership, suggesting these incidents had little probative value when compared to the remaining evidence. He also asserts this evidence was highly prejudicial, as other crimes evidence often is, thus creating an undue risk of prejudice.

The basis of Legaspi's argument is the inherently prejudicial nature of testimony related to criminal street gangs. (People v. Albarran (2007) 149 Cal.App.4th 214, 223.) "'We have recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged.' [Citation.]" (People v. Brown (2003) 31 Cal.4th 518, 547.) Because of this "highly inflammatory impact" (People v. Cox (1991) 53 Cal.3d 618, 660, overruled on other grounds in People v. McKinnon (2011) 52 Cal.4th 610, 637-638), the Supreme Court has "condemned the introduction of evidence of gang membership if only tangentially relevant" to the issues in the case. (Cox, at p. 660.) However, gang evidence generally is admissible if it is logically relevant to issues in the case, is more probative than prejudicial, and is not cumulative. (Albarran, at p. 224.)

Gumm's testimony about criminal street gangs was very probative. Not only was Legaspi charged with criminal street gang enhancements pursuant to section 186.22, subdivision (b), Gumm's testimony was relevant to the issue of motive for the killing of Slefo. Gumm explained Casper recently had been murdered by Norteños, resulting in the Sureños seeking revenge. In addition, the confrontation at the fast-food restaurant shortly before the shooting escalated the tension in the neighborhood. Legaspi's involvement in this incident, as well as his close friendship with Casper, provided motive for the killing of Slefo.

Legaspi's argument focuses on the conflict between relevance and inherent prejudice of criminal street gang evidence. We are not, however, the first court to address the issue. Indeed, this issue frequently has been litigated.

The Supreme Court recently considered the issue of a gang member's prior criminal activity in this context in People v. Tran (2011) 51 Cal.4th 1040 (Tran). The issue presented was whether the prosecution could use evidence the defendant committed a prior criminal act as one of the predicate offenses, i.e., one of the two offenses required to establish the gang engaged in a "pattern of criminal activity," as that term is defined in section 186.22, subdivision (e). The testimony established Tran was a member of a criminal street gang, he had attempted to kill a rival gang member, and in the process he killed a bystander. To establish the predicate offenses, the prosecution presented testimony about an incident where a gang member shot three men in retaliation for another murder and for a series of extortions committed by the defendant. Certified records were provided to prove both incidents resulted in criminal

convictions. Tran objected to the evidence related to his extortion conviction. The Supreme Court rejected the argument.

"Defendant contends that even if the STEP Act allows a predicate offense to be established by evidence of a defendant's offense on a separate occasion, the inherent prejudice in such evidence generally requires its exclusion under Evidence Code section 352, which provides: 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'

"Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial. [Citations.] But Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]

"In [People v.] Ewoldt [(1994) 7 Cal.4th 380], for example, a prosecution for lewd acts committed against a child under the age of 14 years, we concluded that the trial court had not abused its discretion by admitting evidence the defendant had committed other, uncharged lewd acts against the victim and her sister. Although the evidence was prejudicial to the defendant, it was also probative, strongly suggesting a common design or plan. [Citations.] We identified several factors that might serve to increase or decrease the probative value or the prejudicial effect of evidence of uncharged misconduct and thus are relevant to the weighing process required by Evidence Code section 352.

"The probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense because the risk that the witness's account was influenced by knowledge of the charged offense is thereby eliminated. [Citation.] On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred. [Citation.] The potential for prejudice is decreased, however, when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense. [Citation.]

"In Ewoldt we concluded that the totality of the circumstances supported the trial court's decision to admit

the evidence of the defendant's uncharged criminal acts. And we so concluded even though not all of the listed factors weighed in favor of admitting the evidence. Thus, we found the evidence admissible although the source of the testimony relevant to the uncharged acts was not wholly independent of the evidence of the charged offense, and the uncharged acts had not resulted in a criminal conviction. [Citation.]

"In cases such as Ewoldt, where evidence is admitted under Evidence Code section 1101, subdivision (b), the evidence is probative because of its tendency to establish an intermediary fact from which the ultimate fact of guilt of a charged crime may be inferred. [Citations.] In prosecutions for active participation in a criminal street gang, the probative value of evidence of a defendant's gang-related separate offense generally is greater because it provides direct proof of several ultimate facts necessary to a conviction. Thus, that the defendant committed a gang-related offense on a separate occasion provides direct evidence of a predicate offense, that the defendant actively participated in the criminal street gang, and that the defendant knew the gang engaged in a pattern of criminal gang activity.

"At the same time, the inherent prejudice from a defendant's separate gang-related offense typically will be less when the evidence is admitted to establish a predicate offense in a prosecution for active participation in a criminal street gang, than when it is admitted to establish an intermediary fact from which guilt may be inferred. 'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.' [Citation.] As we explained in People v. Doolin (2009) 45 Cal.4th 390: '"The prejudice that section 352 '"is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors."'"' [Citation.] That the evidence provided direct evidence of some of the elements of the prosecution's case thus does not weigh against its admission. In addition, because the prosecution is required to establish the defendant was an active participant in a criminal street gang and had knowledge of the gang's criminal activities, the jury inevitably and necessarily will in any event receive evidence tending to show the defendant actively supported the street gang's criminal activities. That the defendant was personally involved in some of those activities typically will not so increase the prejudicial nature of the evidence as to unfairly bias the jury against the defendant. In short, the use of evidence of a defendant's separate offense to prove a predicate offense should not generally create 'an intolerable "risk to the fairness of the proceedings or the reliability of the outcome."' [Citation.]" (Tran, supra, 51 Cal.4th at pp. 1046-1048.)

27

The Supreme Court also rejected Tran's argument that evidence of his crime should not be admitted when it is cumulative, i.e., when the prosecution has the ability to develop evidence of offenses committed by other gang members. "But defendant cites no authority for the argument that the prosecution must forgo the use of relevant, persuasive evidence to prove an element of a crime because the element also might be established through other evidence. The prejudicial effect of evidence defendant committed a separate offense may, of course, outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute. [Citations.] But the prosecution cannot be compelled to '"present its case in the sanitized fashion suggested by the defense."' [Citation.] When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not unduly prejudicial and its admission is not an abuse of discretion. Further, a rule requiring exclusion of evidence of a defendant's separate offense on the theory the prosecution might be able to produce evidence of offenses committed by other gang members would unreasonably favor defendants belonging to large gangs with a substantial history of criminality." (Tran, *supra*, 51 Cal.4th at pp. 1048-1049.)

The Supreme Court emphasized there were limits on the admission of such evidence. "That evidence of a defendant's separate offense may be admissible to prove a predicate offense does not mean trial courts must in all cases admit such evidence when offered by the prosecution. Considerations such as those described in People v. Ewoldt, *supra*, 7 Cal.4th at pages 404-405, will still inform the trial court's discretion and in an individual case may require exclusion of the evidence. Further, although the court need not limit the prosecution's evidence to one or two separate offenses lest the jury find a failure of proof as to at least one of them, the probative value of the evidence inevitably decreases with each additional offense, while its prejudicial effect increases, tilting the balance towards exclusion. And the trial court of course retains discretion to exclude details of offenses or related conduct that might tend to inflame without furthering the purpose for admitting the evidence." (Tran, *supra*, 51 Cal.4th at p. 1049.)

With these principles in mind, we turn to the evidence about which Legaspi complains. The first incident was the October 31, 2006, incident where Legaspi confronted two individuals wearing red in the apparent belief they were Norteños. Legaspi denied hitting a woman in the face, and he apparently suffered a broken arm. The relevance of this incident is apparent. Legaspi confronted two individuals simply because he believed they belonged to a rival gang. This is the same motive the prosecution argued resulted in the killing of Slefo. This evidence also strongly suggested Legaspi was a member of the Sureño criminal street gang. Therefore, the evidence was highly probative.

Moreover, the possible prejudice was slight. We recognize this was not one of the predicate offenses on which the prosecution relied. However, the testimony was brief — Gumm testified Legaspi admitted the confrontation but denied hitting the woman, and the only injury to which Gumm testified was a broken arm suffered by Legaspi. We thus conclude the trial court did not abuse its discretion when it admitted this testimony.

The second incident occurred on February 15, 2007, and was one

of the predicate offenses presented by the prosecution. In this incident, Legaspi shot a firearm at a vehicle passing by his house, apparently believing the occupants were Norteños who were responsible for throwing a Molotov cocktail in his driveway. The prosecution introduced certified court documents to establish Legaspi was convicted in a juvenile petition (the allegations of the petition were found true) of assault with a deadly weapon as a result of this incident, thus minimizing the possibility the jury would find him guilty in the Slefo case to punish him for the prior shooting. While Legaspi's conduct was reprehensible, it was much less inflammatory than the shooting death of Slefo. Again, the testimony was highly relevant to the issues of motive, gang membership, knowledge of the gang's criminal activities, and to explain conduct unfamiliar to most jurors. We conclude the trial court did not abuse its discretion when it determined this evidence was more probative than prejudicial.

The final incident occurred on September 22, 2009, when Legaspi attempted to drive his vehicle into a Norteño who was flashing gang signs at Legaspi. This incident was not a predicate offense, but was relevant to establish motive and the ongoing conflict between Norteños and Sureños. The evidence supported Gumm's opinion that Legaspi was a member of a criminal street gang and demonstrated an instance when a member of a criminal street gang reacted in violent manner when he was "disrespected." The incident was not inflammatory as there was no evidence of injury to any party. Accordingly, we conclude the trial court did not abuse its discretion when it determined this testimony was admissible.

We reiterate, this was a case involving criminal street gangs and was motivated by the code of conduct adopted by these gangs. Evidence about these gangs, as well as evidence about their behavior, was essential, i.e., highly relevant. The remaining incidents about which Gumm testified were innocuous, and these three incidents were trivial when compared to the calculated shooting that resulted in Slefo's death. The trial court did not abuse its discretion.

People v. Legaspi, 2014 Cal. App. Unpub. LEXIS 3176 at 22-35.

## 2.    Legal Standard

Evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process. See Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) citing Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." See Estelle at 67-68. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. Id. The court's habeas powers do not allow for the vacatur of a conviction "based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling" on the

1    admissibility of evidence. Id. at 72.

2         California Evidence Code section 801(b) allows an expert witness to give opinion

3    testimony if the opinion is "[b]ased on matter ... perceived by or personally known to the

4    witness or made known to him at or before the hearing, whether or not admissible, that is

5    of a type that reasonably may be relied upon by an expert in forming an opinion upon the

6    subject to which his testimony relates." California Evidence Code § 801.

7         There is no clearly established law supporting the "proposition that the

8    Constitution is violated by the admission of expert testimony concerning an ultimate

9    issue to be resolved by the trier of fact." See Briceno, 555 F.3d at 1078. "Although a

10   witness is not permitted to give a direct opinion about the defendant's guilt or innocence

11   .... an expert may otherwise testify regarding even an ultimate issue to be resolved by

12   the trier of fact." See Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009) (citation

13   omitted, internal quotations omitted).

14                        **3.    Discussion**

15        Petitioner claims that he was denied a fair trial because the gang expert's opinion

16   was prejudicial. Although phrased as hypotheticals, the jury accepted the expert's

17   opinion as direct testimony of Petitioner's motive, knowledge and intent to commit the

18   crime. Further, though instructed to only view the evidence as a basis for the expert's

19   opinion, the jury heard evidence of Petitioner's past criminal activity, which is inherently

20   prejudicial. The question presented on federal habeas review is whether the admission

21   of the gang expert's testimony violated Petitioner's federal constitutional rights. In light of

22   the fact that the expert relied on information that was permissible under California law,

23   and of a type that would reasonably be relied upon by experts in the field, Petitioner has

24   not alleged a violation of his federal rights. See Estelle, 502 U.S. at 67-68. While he

25   argues that the testimony rendered his trial fundamentally unfair, the state court found

26   that the statements did not render the trial unfair based on the fact that the incidents

27   were highly relevant to the present offense, and properly admitted. This Court finds the

28   state court's decision reasonable, and that fair-minded jurists would debate whether the

expert witness testimony resulted in a fundamentally unfair trial. The state court decision did not result in a decision that was contrary to, or an unreasonable application of federal law. Accordingly, admission of the expert testimony did not violate Petitioner's right to a fair trial and Petitioner is not entitled to habeas corpus relief.

## IV.     Recommendation

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.


Dated:   <u>January 1, 2017</u>            <u>/s/ Michael J. Seng</u>
                                          UNITED STATES MAGISTRATE JUDGE